152 So. 297

**In re CANAL BANK & TRUST CO.'S LIQUIDATION.**

**Intervention of F. D. WILCOX CO.**

No. 32611.

Dec. 21, 1933.

Dufour, St. Paul, Levy & Miceli, of New Orleans (Norton L. Wisdon, of New Orleans, of counsel), for appellant.

Monroe & Lemann, of New Orleans, for appellee F. D. Wilcox.

ODOM, Justice.

F. D. Wilcox, operating under the trade-name of F. D. Wilcox Company, is an importer and purchased 250 bags of coffee from an exporter in Brazil, under an agreement which provided that the buyer should furnish an American bankers' letter of credit at ninety days' sight through the Canal Bank & Trust Company of New Orleans. Carrying out this contract, Wilcox procured from the bank a letter of credit addressed to the exporter in Brazil authorizing it to draw on the bank up to $2,474 at ninety days' sight for the invoice price of the coffee, covered by negotiable bills of lading, upon the terms and conditions shown in the letter of credit. The letter of credit was forwarded to the merchant in Brazil. As a consideration for the issuance of the letter of credit and the acceptance and payment of the draft, Wilcox signed an agreement dated January 16, 1933, by the terms of which he was to deposit with the bank sufficient funds to take up the acceptance under the letter of credit three days before its maturity. He further agreed to pay the bank three-eighths of one per cent. of the amount of the draft as consideration for its furnishing the credit.

The foreign exporter shipped the coffee to Wilcox at New Orleans and drew its draft on the bank for the above amount, with bill of lading attached. On February 20, 1933, the bank accepted the draft drawn by the shipper in accordance with the letter of credit. When the shipment arrived at the port in New Orleans, the bank, upon written application of the consignee, delivered to him the bill of lading upon the execution of a trust receipt which recited that Wilcox had received in trust from the Canal Bank & Trust Company the bills of lading held by it as collateral pledged to secure advances made to him, and that in consideration of the release of the bills of lading, Wilcox expressly agreed to pay over to the bank or its assigns the proceeds of the sale of the property described in or represented by the bill of lading; or should the amount of said proceeds exceed the entire indebtedness to the bank arising from the letter of credit transaction, Wilcox agreed to pay to the bank a proportion thereof equal to the full amount of said indebtedness in principal and in interest.

Wilcox presented the bills of lading to the carrier and secured delivery of the 250 bags of coffee, which he subsequently sold, and at the time the present suit was filed had the proceeds in his hands.

The acceptance matured on May 22, 1933. But under the terms of the letter of credit contract, Wilcox was to furnish the bank with funds "for the same amount," that is, the amount of the draft, three days before its maturity, or by May 19. But he did not deliver or offer to deliver to the bank at that time funds sufficient to take up the draft, the reason being that the bank at the time was operating on a restricted basis pursuant to presidential orders which went into effect in the early part of March and continued until the bank went into liquidation on May 20. So that on May 19, the day on which he had agreed to deliver to the bank funds sufficient to take care of the acceptance, it was impos-

sible for the bank to discharge the obligation which it had assumed of paying the acceptance in full and thereby relieve Wilcox of his obligation to the exporter in Brazil.

On the following day, May 20, the bank went into liquidation, its affairs being taken over by the state bank commissioner. The acceptance was presented to the liquidators of the bank for payment by the Federal Reserve Bank of Atlanta, through its New Orleans Branch, and payment was refused.

It is proved, in fact admitted, that when the acceptance matured, Wilcox stood ready and willing to pay and retire the acceptance and relieve the bank of its obligation on account thereof, provided the bank, through its liquidator, would simultaneously cancel and deliver the trust receipt. Wilcox tendered to the Federal Reserve Bank the amount of the acceptance, and the Federal Reserve Bank in turn offered to pay the liquidator the full amount of the acceptance provided that the liquidator would cancel and surrender the trust receipt. This offer was refused.

It is admitted that if Wilcox had, on the date of the maturity of the acceptance or three days prior thereto, paid to the bank or to the liquidator the amount of the acceptance, neither the bank nor the liquidator could have paid the full amount thereof to the exporter. It is further shown that at the time this suit was tried the liquidator could pay only 35 per cent. thereof in the way of a dividend.

Wilcox intervened in the liquidation proceedings, setting out the facts as stated above and prayed that the liquidator be ordered to show cause why an order of court should not be entered directing him or his agents to permit intervener to redeem the trust receipt by payment of the proceeds of the coffee to the holder of the acceptance up to the amount thereof and directing him, upon such payment, to cancel and surrender the trust receipt.

The liquidator answered and admitted in substance the facts alleged. He denied, however, some of the alleged legal effects of the transactions above recited, and assuming the position of plaintiff in reconvention, alleged that Wilcox had violated his obligation to deposit the amount of the acceptance and prayed for judgment against him in the amount thereof.

There was judgment making absolute the rule sued out by intervener, expressly directing the liquidator of the bank to permit intervener to redeem the trust receipt by payment of the proceeds of the coffee to the holder of the acceptance up to the amount thereof and directing the liquidator to cancel and surrender the trust receipt to intervener upon such payment. The liquidator appealed.

The contention of Wilcox, the intervener, is that inasmuch as the bank has defaulted on the obligation which it assumed under the letter of credit transaction, of paying the amount of the acceptance to the importers or the holders of the acceptance, he should be permitted to pay the same out of the proceeds of the coffee and that upon the payment thereof, the bank, represented by the liquidator, should cancel and deliver to him the trust receipt.

The liquidator contends that Wilcox should deliver the proceeds of the coffee or a sufficient amount thereof to pay the acceptance,

into his hands, the same to become part of the general assets of the bank to be distributed to its creditors in due course of liquidation. Stated differently, the liquidator insists that Wilcox should be required to live up to his contract, although he confesses the inability of the bank, through him as liquidator, to pay the acceptance in full as contemplated.

The question presented by the pleadings and respective contentions of the parties is whether a bank which has accepted drafts drawn under a letter of credit, but, due to insolvency or liquidation proceedings, becomes unable to pay them when presented, can recover the amount of the drafts from the party at whose instance the letter of credit was issued under his agreement to pay the bank a sufficient amount to cover the drafts drawn thereunder. In other words, whether the bank can, under the circumstances here presented, compel Wilcox to perform his obligation to it when it confesses its own inability to carry out the agreement in this letter of credit transaction.

It cannot, the reason being that the consideration, which induced Wilcox to agree to place in the bank sufficient funds to pay the acceptance, failed. The bank was unable to comply with its agreement and is therefore in no position to demand that Wilcox comply with his.

A contract, to be valid, must have a cause or consideration, by which it is meant the motive for making it. C. C. art. 1896. Where the cause or consideration of the contract "really exists at the time of making it, but afterwards fails, it will not affect the contract, if all that was intended by the parties be carried into effect at the time." C. C. Art. 1898.

"But, if the contract consist of several successive obligations to be performed at different times, and the equivalent is not given in advance for the whole, but is either expressly or impliedly promised to be given at future periods; then, if the cause of the contract, corresponding to either of the successive obligations, should fail, the obligation depending on it will cease also." Article 1899.

The rights and obligations of the parties here involved are governed by the latter article of the Code. Wilcox and the bank entered into contracts which involved reciprocal obligations. There was a cause or consideration which induced each to make the contract. Wilcox agreed to furnish the bank with sufficient funds to pay and retire the draft for $2,474, to be drawn by a foreign exporter in payment of merchandise purchased by him. The moving consideration for making this agreement to furnish the bank with these funds was the reciprocal agreement or promise on the part of the bank not only to accept the draft but to pay it when presented. The bank complied with its agreement or promise in part only. It accepted the draft but admitted its inability to pay it when presented.

There was nothing given in advance by either party at the time the contract was entered into, but each agreed or promised that something would be given or done at a future period. When the period for performance arrived, the bank could not perform. It was in liquidation and for that reason unable to pay the draft which it had accepted.

Having thus failed in its agreement, the obligation which Wilcox had assumed toward it ceased.

The identical question here presented has not heretofore been passed upon by this court. But it is not new in jurisprudence. The case of Greenough v. Henry Munroe et al. (C. C. A.) 53 F.(2d) 362, 363, 80 A. L. R. 797, is practically on all fours with this one.

In that case the facts presented were almost identical with those here. The defendants, who were private bankers doing business in the city of New York, at the request of a certain local importer, issued irrevocable letters of credit in favor of certain merchants in the Orient, from whom the local importer wished to purchase goods. To quote from the body of the opinion:

"In consideration thereof, Olivier [who was the local importer] agreed with the Munroe firm to pay a sufficient amount 'to cover all drafts drawn under said credits together with commissions and interest and expenses where chargeable,' and that title to the property purchased, and the proceeds thereof, should be in the Munroe firm until all drafts under the letters of credit and all other indebtedness of Olivier to the firm should be paid. * * * Thereafter Olivier contracted with the respective merchants for the purchase of goods, and the sellers drew four months' drafts upon the Munroe firm under the letters of credit. The drafts, accompanied by proper shipping documents, were discounted by Oriental banks, sent forward to the Munroe firm for acceptance, and accepted; but before maturity of the drafts a receiver of the Munroe firm was appointed

in the above-entitled suit. Some of the drafts matured and were not paid, and it was apparent that the others would be dishonored at maturity. In the meantime the purchased merchandise had arrived, and was delivered to Olivier upon trust receipts given by the latter to the Munroe firm, or, in one instance, to its receiver, under a stipulation precluding the waiver thereby of any rights. The trust-receipt provided that Olivier would hold the merchandise covered by it as the property of the Munroe firm until the acceptance of the draft given as the purchase money of said merchandise under the specified letter of credit shall have been paid the Munroe firm, with liberty, however, to sell, all proceeds of sales 'to apply * * * against the acceptance.'"

The receiver demanded that Olivier account for the goods or their proceeds held under the trust receipts. "Olivier filed its petition asking leave to redeem its trust receipts by exhibiting to the receiver proof of its payment of the drafts accepted by John Munroe & Co., or, in the alternative, that the moneys to be paid to the receiver under the trust receipts be impressed with a trust for payment of the respective drafts."

What happened in the Munroe Case is almost precisely what happened in the case at bar. Not only that, but the proceedings instituted by the importer were the same as those brought by the importer here; the only difference being that the importer in that case made the alternative demand that in case it was held that it should pay the proceeds of the goods to the bankers, then that the proceeds should be impressed with a trust for the payment of the respective drafts.

In that case, as here, the consideration which induced the local importer to agree to deposit in the bank sufficient funds to pay the drafts failed, and on that ground the court held as follows, to quote paragraph 6 of the syllabus as it appears in 80 A. L. R. 797:

"A bank which has accepted but refused to pay drafts drawn under á letter of credit issued by it cannot recover the amount of the drafts from the one at whose instance the letter of credit was issued under his agreement to pay the bank a sufficient amount to cover all drafts drawn thereunder."

Petition for writ of certiorari in the Munroe Case was denied by the Supreme Court of the United States, November 23, 1931. Irving Trust Co. v. Oliver Straw Goods Corp'n, 284 U. S. 672, 52 S. Ct. 127, 76 L. Ed. 568.

In a note which follows the Munroe Case as published in 80 A. L. R. 803, it is stated:

"An arrangement between a bank issuing a letter of credit whereby it agrees to honor drafts drawn thereon in accordance with the terms and conditions thereof, as between the bank and the procurer of the letter, constitutes a contract the consideration of which upon the part of the bank is the honoring of the drafts, and where the consideration fails by reason of the insolvency of the bank and its consequent inability to pay the drafts, the contract fails and the bank cannot enforce against the procurer of the letter his agreement to deposit money to cover the drafts drawn under the letter, the bank conceding its inability to honor the drafts and its un-

willingness to apply any money paid it by the procurer of the letter exclusively to such payment."

The annotator further says that the holding in the Munroe Case seems to be in harmony with other holdings relative to the rights of the parties where the bank issuing a letter of credit becomes insolvent and unable to pay drafts drawn under the letter, citing Leslie v. Bassett, 129 N. Y. 523, 29 N. E. 834; also, case under same title reported in 123 N. Y. 396, 25 N. E. 386; Bank of U. S. v. Seltzer (1931) 233 App. Div. 225, 251 N. Y. S. 637, and Sexton v. Fensterer (1914) 154 App. Div. 542, 139 N. Y. S. 811 (affirmed without opinion in 213 N. Y. 641, 107 N. E. 1085). Also, certain English cases which seem to support the holding in the Munroe Case.

Under the view which we take of this case, it is not necessary to consider the questions of suretyship and subrogation so ably presented by counsel for the bank in their brief, nor to consider what the legal consequences would have been had Wilcox paid the funds into the bank, thus commingling them with other funds so as to make their identification impossible. It suffices to say that had that been done, a different situation would have been presented.

Wilcox induced the bank to issue the letter of credit and to accept the draft drawn by his creditor. By acceding to the request, the bank became bound for the payment of the draft, and whether it was bound as surety for Wilcox, or as a principal obligor, is not material. What Wilcox proposes to do is to use the proceeds of the coffee in paying

the draft, thereby relieving the bank of the obligation it assumed by issuing the letter of credit and accepting the draft. His prayer is that he be permitted to pay the draft and cancel the bank's acceptance and that, upon such payment, the liquidator surrender the trust receipt. His demands are well founded both in law and equity. There is nothing in all these transactions to indicate that the shipper of the coffee intended to accept the bank's letter of credit as absolute payment of the amount due by Wilcox and to release him from all liability as soon as the draft was accepted. We must assume, therefore, that such was not intended. It follows that Wilcox, as well as the bank, was bound to pay the draft and that he would be called upon in due course to pay it. It would work injustice and hardship upon him to require the payment of this amount to the liquidator, who may never be able to pay the acceptance in full, and also pay the same amount to his creditor in Brazil.

On reading the testimony we find that from early in March to the date on which the bank went into liquidation, during which time the bank was operating on a restricted basis, and for that reason could not pay such acceptances in full, it, on the advice of counsel, permitted the handling of such transactions in the manner here sought to be done by Wilcox. The liquidator, however, was not willing to continue that course unless so ordered by the court.

For the reasons assigned, the judgment appealed from is affirmed, with all costs.

ST. PAUL, J., takes no part.